# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2013-CT-02002-SCT

*MISSISSIPPI DEPARTMENT OF AUDIT,
STACEY PICKERING, JIM HOOD, CHRIS LOTT,
DAVID HUGGINS, MELISSA C. PATTERSON,
JOSEPH A. RUNNELS, JR., SANDRA R.
CHESTNUT AND HAROLD E. PIZZETTA, III*

*v.*

*GULF PUBLISHING COMPANY, INC.*

| | |
|---|---|
| DATE OF JUDGMENT: | 11/04/2013 |
| TRIAL JUDGE: | HON. JENNIFER T. SCHLOEGEL |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: MARGARET P. ELLIS |
| | JUDY T. MARTIN |
| | ARTHUR F. JERNIGAN, JR. |
| | JOHN G. CORLEW |
| | ROBERT V. GREENLEE |
| | ALAN M. PURDIE |
| | MELISSA C. PATTERSON |
| | RONALD G. PERESICH |
| | ROY MERRITT TIPTON |
| | WILLIAM V. WESTBROOK, III |
| | SAMUEL E. L. ANDERSON |
| | LYNN CHAIN WALL |
| | JOHN T. KITCHENS |
| | THOMAS EUGENE WHITFIELD, JR. |
| | DION JEFFERY SHANLEY |
| ATTORNEY FOR APPELLEE: | HENRY LAIRD |
| NATURE OF THE CASE: | CIVIL - STATE BOARDS AND AGENCIES |
| DISPOSITION: | AFFIRMED IN PART; REVERSED IN PART; VACATED IN PART; RENDERED IN PART; AND REMANDED IN PART - 11/16/2017 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

# CONSOLIDATED WITH

# NO. 2014-CT-00894-SCT

*MELISSA C. PATTERSON, STACEY PICKERING, INDIVIDUALLY, DAVID HUGGINS, INDIVIDUALLY, CHRIS LOTT, INDIVIDUALLY, MISSISSIPPI DEPARTMENT OF AUDIT, STACEY PICKERING IN HIS OFFICIAL CAPACITY AS STATE AUDITOR FOR THE STATE OF MISSISSIPPI, HAROLD E. PIZZETTA, III, MISSISSIPPI DEPARTMENT OF MARINE RESOURCES, JOSEPH A. RUNNELS, JR., SANDRA R. CHESNUT AND JIM HOOD*

**v.**

*GULF PUBLISHING COMPANY, INC.*

| | |
|---|---|
| DATE OF JUDGMENT: | 05/27/2014 |
| TRIAL JUDGE: | JENNIFER T. SCHLOEGEL |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | ARTHUR F. JERNIGAN |
| | RONALD G. PERESICH |
| | JOHN T. KITCHENS |
| | ALAN M. PURDIE |
| | MARGARET P. ELLIS |
| | JOHN G. CORLEW |
| | WILLIAM V. WESTBROOK |
| | ROY MERRITT TIPTON |
| | DION JEFFERY SHANLEY |
| | MELISSA C. PATTERSON |
| | SAMUEL E. L. ANDERSON |
| | JUDY T. MARTIN |
| | LYNN CHAIN WALL |
| | ROBERT V. GREENLEE |
| | THOMAS EUGENE WHITFIELD |
| ATTORNEY FOR APPELLEE: | HENRY LAIRD |
| NATURE OF THE CASE: | STATE BOARDS AND AGENCIES |
| DISPOSITION: | N/A |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**BEAM, JUSTICE, FOR THE COURT:**

¶1.     The Court of Appeals reversed and rendered a final judgment entered by the Harrison County Chancery Court, in which the chancery court held that: (1) Gulf Publishing's (GP) records request under the Mississippi Public Records Act (MPRA) was not subject to any exemptions contained in the act; (2) the Department of Marine Research (DMR) acted in bad faith by asserting defenses for the purpose of delay in violation of the Mississippi Litigation Accountability Act (MLAA); (3) DMR willfully and wrongfully denied GP's records requests; (4)  the State Auditor acted in bad faith and willfully and wrongfully denied GP's requests; (5) the State Auditor was in civil contempt from November 4, 2013, until it purged itself on December 5, 2013, when it filed a motion with the federal district court, seeking permission to release the records requested by GP, which were then in the custody of a federal grand jury; therefore, the State Auditor was liable for attorney's fees and expenses resulting from the contempt; (6) GP was entitled to attorney's fees under the MPRA, the MLAA, and relevant caselaw for contempt and monetary sanctions for bad faith; (7) DMR and the State Auditor were jointly and severally liable for attorney's fees and other expenses; and (8) the following individuals were fined $100 each pursuant to the MPRA, for their participation in the willful and wrongful denial of GP's public-records request: State Auditor Stacey Pickering, Attorney General Jim Hood; Director of Investigations David Huggins, Investigator Chris Lott, Special Assistant Attorneys General Melissa Patterson, Joseph Runnels, Sandra Chestnut, and Harold Pizzetta.

¶2. GP petitioned this Court for writ of certiorari, which was granted. Having reviewed the record and considered GP's claim(s), we find the Court of Appeals should not have reached the question of whether the investigative-report exemption under the MPRA applied in this instance. As will be explained, that claim was waived. Therefore, that portion of the Court of Appeals' judgment holding that the public records sought by GP were exempt under the MPRA's investigative-report exemption is overruled.

¶3. We find that the Department of Audit, as a public body defined by Mississippi Code Section 25-61-3(a), is liable to GP for the civil penalty prescribed Mississippi Code Section 25-61-15, along with reasonable expenses and attorney's fees as found by the chancery court, for denying GP access to public records not exempt from the provisions of the MPRA.[1]

¶4. Also, we find no error in the chancery court's decision to fine Huggins $100 under the penalty provision contained in MPRA. *See* Miss. Code Ann. § 25-61-15 (Rev. 2010).

## FACTS AND PROCEDURAL HISTORY[2]

¶5. In 2012, a joint federal and state task force began investigating DMR for misappropriation of funds. The investigation lead to the indictments and convictions of several individuals, including former DMR Director Dr. Bill Walker; DMR Chief of Staff

---

[1] For purposes of this opinion, the Department of Audit refers collectively to the Mississippi Office of the State Auditor and the Mississippi State Auditor, Stacey Pickering, unless otherwise stated.

[2] Most of the facts and procedural history are taken from the Court of Appeals' opinion in *Mississippi Department of Audit v. Gulf Publishing Co., Inc.*, 2016 WL 1212695 (Miss. Ct. App. March 29, 2016).

4

Joe Ziegler; DMR official Tina Shumate; D'Iberville City Manager Michael Janus; and Dr. Walker's son, Scott Walker.

¶6.     During the investigation, on November 14, 2012, GP's subsidiary newspaper, *The Sun Herald*, submitted a written records request[3] to DMR, in accordance with Mississippi Code Section 25-61-5 of the MPRA. Miss. Code Ann. § 25-61-5 (Rev. 2010). DMR communicated its willingness to comply with the newspaper's request, but DMR and the newspaper could not agree on costs.

¶7.     The newspaper submitted a second request on December 27, 2012, for additional records.[4] Before DMR's compliance or response was due, the Harrison County grand jury subpoenaed the same records covered by the newspaper's November 14 and December 27 requests.

---

[3] "1. All paperwork, documents and records of money transfers, payments, invoices, contracts, copies of checks, check stubs, an account of all money spent, including copies of leases, on boats leased by the DMR from the Mississippi Marine Resource Foundation or Marine Resource Foundation from 2006 to present. This should include records of expenditures by the DMR for repairs to the boats. 2. All documents related to expenditures and funding sources for the DMR account label 601. The funding source for the 601 account, all deposits; and all of DMR's New Sub-Grant Concurrence Worksheets that use the 601 account as a funding source. 3. All MOUs, MOAs, documents, paperwork and money exchanged between the DMR and the Institute for Marine Mammal Studies. 4. An expanded, complete explanation, including project work sheet and applications, for the Coastal Impact Assistance Program (CIAP) project listed on the Executive Summary Final Mississippi Coastal Impact Assistance Plan (Revised), 2007-2010 Plan Update 1 (through August 31, 2010), State of Mississippi. Mississippi Department of Marine Resources and Boards of Supervisors for Jackson, Hancock and Harrison counties as MS.R.747 – New Beginnings for Marine Education USM GCRl $8,000,000."

[4] "[A]ccount receipts, expenditures & balances for Artificial Reef Program Account–for fiscal years ending June 30 of 2008, 2009, 2010, 2011, 2012."

¶8.     The subpoenas, issued at the behest of the Department of Audit on January 6 and 9, 2013, required DMR's records to "to be 'retained in-place,'" to "be accessible upon demand by agents of the Mississippi Office of State Auditor," and to "be released to no entity other than [the Department of Audit]." The subpoenas also stated, "This subpoena . . . may be satisfied by mailing or delivering a certified copy of said records[.]" Alleging the subpoenas prohibited DMR from releasing its records to anyone other than the state auditor, DMR informed *The Sun Herald* in writing that it could no longer comply with the public-records requests.

¶9.     On January 15, 2013, the Department of Audit took possession of the records pursuant to the subpoenas. Almost all of the records had electronic copies. But a few records existed as uncopied and unscanned originals.

¶10.    The next day, on January 16, 2013, GP sued DMR in the Harrison County Chancery Court to compel production of the records, without service upon the Attorney General, but instead upon DMR's director.

¶11.    A week later, on January 22, 2013, special assistant attorneys general assigned to both DMR (Joseph Runnels) and the Department of Audit (Melissa Patterson), worked together to submit a protective order to the Harrison County Circuit Court.[5] DMR filed the motion for protective order in the circuit court, and the Department of Audit, through Patterson, signed off on the motion. The circuit court found "the . . . subpoena . . . prohibit[ed DMR] from complying with the [MPRA]." Therefore, the circuit court modified the subpoena to

_____

[5] Runnels and Harold Pizzetta, both of the Attorney General's Office, presented the motion and proposed order to the circuit court.

6

permit DMR to release to GP public records in its possession, even if those records also were subject to the subpoena.

¶12. On January 23, 2013, Counsel for GP Henry Laird and Counsel for DMR Runnels appeared before the chancery court. Laird told the chancery court that the parties were still working on a resolution and announced that he did not see any reason to go forward with the expedited hearing set for that day. Laird said there were two categories of records, one computerized, the other comprised of hard copies, which were voluminous.[6] According to Laird, they were attempting to work out an arrangement for GP to have access to the boxes containing the hard copies so GP could identify what documents, if any, within those boxes they wanted, and then have DMR make copies for GP.

¶13. Days later, DMR downloaded 22,215 records to a "DVD+R" and handed it over to GP. The only records that were not released to GP were the uncopied and unscanned originals no longer in DMR's possession, but in the Department of Audit's possession.

¶14. Another hearing was held on April 23, 2013, at which the chancery court heard GP's claim that it was still seeking the records for which no electronic copy was available. DMR moved to dismiss, claiming GP had failed to prove that DMR wrongfully had denied the requests. The chancery court said it could "not force DMR to turn over records that they no longer possess or have access to[.]" Thus, the chancery court deemed the Department of Audit a "necessary party since they are the ones in physical custody and possession of all the

---

[6] There were approximately three to four boxes of uncopied and unscanned originals scattered throughout approximately thirty-eight boxes and two filing cabinets–or sixty boxes total.

documents that [GP] now seeks." The court ended the hearing by giving GP permission to join the Department of Audit as a necessary party.

¶15.    GP filed a motion to amend its first complaint four months later, on August 16, 2013. And on August 26, 2013, GP filed a new, separate lawsuit, naming DMR and the Department of Audit as defendants, which was properly served on the Attorney General.  The motion to amend was granted on September 10, 2013.  The two lawsuits were consolidated.

¶16.    DMR answered the second complaint by asserting that it had not wrongfully denied GP's requests, and that GP's claim already had been litigated in the first lawsuit.  As part of its answer, the Department of Audit asserted the records in its possession were exempt under the MPRA's "investigative report" exemption.  *See* Miss. Code Ann. § 25-61-3(f) (Supp. 2016).

¶17.    The chancery court heard GP's second claim on October 30 and 31, 2013.  During the hearing, the chancellor instructed the Department of Audit to bring the records to the courthouse.  Before the records arrived, the chancery court had ruled from the bench that the records did not fall under the investigative-reports exemption.  The chancery court allowed the documents to be taken from the courthouse and instructed the Department of Audit to copy the records or put DMR in a position to comply with GP's requests.

¶18.    Though the chancery court later would rescind this statement, the court stated at the end of the hearing that "there has been no evidence presented to the [c]ourt that . . . DMR has done anything other than attempt to comply with the records request, at least based upon the

8

evidence the [c]ourt has been presented." The chancery court, however, reserved the right to add, alter, amend, and/or revise her bench ruling when reduced to writing.

¶19.    That same day, on October 31, an Assistant United States Attorney (AUSA) attempted to contact the chancellor. The chancellor did not speak with the AUSA or return his phone calls.

### Federal Subpoena

¶20.    Before the chancery court's bench ruling was reduced to writing, the Clerk of Court for the United States District Court for the Southern District of Mississippi, through the AUSA, issued a subpoena on November 4, 2013, commanding the Department of Audit's Director of Investigations, Huggins, to appear the next day, at 9 a.m., at the federal building in Jackson, Mississippi, and to bring all the DMR records in the Department of Audit's possession.

¶21.    Around 2:40 p.m. on November 4, Huggins informed the Department of Audit attorney, Melissa Patterson, of the federal subpoena. At around 5 p.m. that evening, Patterson notified the chancellor. Subsequently, at approximately 7:00 p.m. that evening, Patterson and GP's attorney, Laird, had a telephonic hearing with the chancellor. Laird suggested that Patterson seek a motion to quash or a protective order. But Patterson represented that she thought Huggins could, instead, appear before the grand jury and explain

why he was unable to bring the records.[7] The chancery court ended the hearing by ordering Patterson to produce the records to the chancery court by 9 a.m. on November 5.

¶22. Shortly before midnight on November 4, the chancellor electronically filed an emergency order immediately seizing the records and ordering they be delivered to the chancery court so they could be copied and Bates-stamped before the Department of Audit complied with the federal subpoena.

¶23. The next morning, on November 5, Patterson contacted Investigator Chris Lott with the Department of Audit to arrange transportation of the records to the chancery court, but learned the records already had been transported to Jackson. Patterson notified the chancellor, and another hearing was held that day in which the chancellor found the Department of Audit in contempt of her October 31 bench ruling and subsequent emergency order filed by the court on the Mississippi Electronic Courts (MEC) system the night before on November 4, directing the Department of Audit to deliver the DMR records to the Harrison County Courthouse at 9 a.m.

¶24. The chancery court issued a bench ruling on November 5, announcing:

> I have no choice at this time but to find that the Auditor by acting in cooperation with the federal prosecutor is in direct contempt of my ruling and my order of last week on October 31, and certainly in direct contempt of my protective order which I issued last night. Now, even if the Auditor cooperated with the federal prosecutor pursuant to the subpoena prior to my protective order being issued last night, nevertheless, the Auditor was certainly aware and under this Court's order to turn the documents over to the DMR.

---

[7] According to the record, Patterson did not inform the chancellor that she (Patterson) was no longer "calling the shots" and had been replaced by Pizzetta from the Attorney General's Office.

10

¶25. That same day, on November 5, the state grand jury and the federal grand jury indicted several individuals in relation to the DMR investigation.

**Interlocutory Appeal**

¶26. On November 6, 2013, the Attorney General's Office submitted a motion in the chancery court to stay all further proceedings pending appeal. And on November 8, 2013, the Department of Audit submitted a combined motion to alter or amend the judgment, to vacate the November 4, 2013, order, and to stay all proceedings pending appeal. On November 21, 2013, the Department of Audit petitioned this Court for interlocutory appeal, along with a motion to stay the chancery court proceedings. On December 3, this Court denied both the petition for interlocutory appeal and the motion to stay.

**Contempt**

¶27. On November 16, 2013, in an order for direction, the chancellor invited GP to file a motion for contempt because "the federal grand jury subpoena itself did not prevent or restrict the copying of the original records requested by the subpoena." GP subsequently filed its motion for civil contempt and attorney's fees against the Department of Audit. GP did not allege that DMR or any other individuals were in contempt.

¶28. The civil contempt hearing started on December 4, 2013. At the beginning of the hearing, the Department of Audit moved for the chancellor to recuse herself, as she already had found the Department of Audit to be in contempt and, thus, reasonably would be perceived as already having bias in this matter. The chancellor held that the Department of Audit had waived the issue and denied the motion.

11

¶29. To make its case for contempt, GP first called State Auditor Stacey Pickering to testify as to why his office chose to comply with the federal subpoena.

¶30. Huggins was then called to testify about the events leading up to the delivery of the records to the federal grand jury, instead of the chancery court. According to Huggins, the AUSA, who was running the federal side of the DMR investigation, contacted him on November 1, 2013. The AUSA asked Huggins to come by the federal building on November 4, causing Huggins to suspect that he might be issued a subpoena. Already concerned about a federal subpoena, Huggins had spoken with Attorney General Hood, who advised, hypothetically, should a federal subpoena come down, Huggins should comply with it.

¶31. Huggins voluntarily went to the federal courthouse on November 4 and was issued a federal subpoena. Huggins said he initially thought he could comply with both the chancery court's ruling and the federal subpoena. He had the records sealed and hoped that would be enough to appear before the grand jury the next day and explain why he did not bring the records.

¶32. Unbeknownst to Patterson, around 6 p.m. on November 4, Huggins decided he had to show up at the federal grand jury or face federal penalties. Huggins said his decision was based on his conversation with Attorney General Hood as well as a conversation with the AUSA. Huggins told the AUSA his plan to try to comply with both the chancery court's ruling and the federal subpoena, but the AUSA advised Huggins to comply with the subpoena. Huggins testified that he called Lott at approximately 6:00 p.m. on November 4. Huggins told Lott that he (Huggins) had been directed by the AUSA to have these records

12

in Jackson by 9:00 a.m. on November 5. Huggins said Lott called him an hour later and said, "We've decided to move tonight."

¶33. The contempt hearing ended with the Department of Audit informing the chancery court that necessary steps were being taken to release the records from the federal court.

**Motion to Release**

¶34. On December 5, 2013, the Department of Audit filed a motion with the federal district court seeking permission to release the records to GP. On December 20, the federal district court ruled the records were not subject to federal grand-jury secrecy and, therefore could be released. *See **United States v. Walker***, No. 1:13–CR–89–KS–MTP, 2013 WL 6805121, at *7 (S.D. Miss. Dec. 20, 2013).

¶35. Pursuant to the federal district court order, on December 27, 2013, the AUSA released the records to the Department of Audit, which then delivered them to the chancery court. Over the next two to three weeks, GP inspected and copied in part the records under supervision of the chancery court.

**Final Order**

¶36. On May 27, 2014, the chancellor entered a sixty-seven-page omnibus final order. Ultimately, the chancellor concluded:

(1) GP's requests were not subject to any exemptions;

(2) GP's requests were not subject to grand-jury secrecy;

(3) Any unadjudicated, posttrial motions were denied;

(4) DMR acted in bad faith, asserting defenses for the purpose of delay in violation of the Mississippi Litigation Accountability Act (MLAA);

13

(5) DMR willfully and wrongfully denied GP's requests;

(6) The Department of Audit also acted in bad faith and willfully and wrongfully denied GP's requests;

(7) The Department of Audit was in civil contempt from November 4, 2013, until it purged itself on December 5, 2013. Therefore, the Department of Audit was liable for attorney's fees and expenses resulting from the contempt;

(8) GP was awarded attorney's fees under the MPRA (Miss. Code Ann. § 25-61-15 (Supp. 2016)), the Mississippi Litigation Accountability Act (MLAA) (Miss. Code Ann. § 11-55-5 (Rev. 2012)), and relevant caselaw for contempt and monetary sanctions for bad faith;

(9) DMR and the Department of Audit were jointly and severally liable for $36,783.50 in attorney's fees and $1,249.95 in expenses; and

(10) The following individuals were fined $100 each "pursuant to 25-61-15 . . . for their participation in the willful and wrongful denial of [GP's] public record requests":

Auditor Stacey Pickering

Attorney General Jim Hood

Lead Investigator David Huggins

Investigator Chris Lott

Special Assistant Attorney General Melissa Patterson

Special Assistant Attorney General Joseph Runnels

Special Assistant Attorney General Sandra Chesnut

Special Assistant Attorney General Harold Pizzetta

**DISCUSSION**

14

¶37. As the Court of Appeals correctly found, the Department of Audit is considered a law-enforcement agency. And as a law-enforcement agency, investigative reports in the agency's possession are exempt from the MPRA. Miss. Code Ann. § 25-61-12(2)(a) (Supp. 2016).

¶38. But as evinced by the language of the subpoenas issued at the behest of the Department of Audit, the documents sought from DMR were original business records "having been used, being in use, or prepared, possessed or retained for use in the conduct, transaction or performance of any business, transaction, work, duty or function of [DMR], or required to be maintained by [DMR]." Miss. Code Ann. § 25-61-3. Each subpoena was nearly identical to the records requests previously sought by *The Sun Herald*.

¶39. On appeal, the appellants assert (as did the Department of Audit in the chancery court) that these documents are exempt under the MPRA under grand-jury secrecy principles. But as the chancery court found, any such claim was waived in this case.

¶40. Again, GP sued DMR in chancery court under the MPRA after DMR informed GP it could no longer comply with GP's record request due to the two grand jury subpoenas that were issued to DMR. After GP filed suit against DMR, special assistant attorneys general assigned to both DMR and the Department of Audit, along with the Attorney General's Office, drafted and submitted a "protective order" on behalf of DMR to the circuit court requesting that the circuit court modify the grand jury subpoena(s) so as to allow DMR to release to GP copies of the public records in DMR's possession.[8]

---

[8] As the dissent points out, the protective order was submitted to the circuit court by DMR. But it was "[a]greed to" by Patterson, Special Assistant Attorney General assigned as counsel for the Department of Audit.

¶41.    The circuit court signed the order. But the order was limited to only those records that remained in DMR's possession, via electronic copies. The order did not provide for the unscanned and uncopied originals in the Department of Audit's possession.

¶42.    Thereafter, GP filed a new lawsuit naming DMR and the State Auditor as defendants. As part of its answer, the Department of Audit claimed that the records in its possession were exempt under the MPRA's investigative-report exemption. No defense was asserted in the Department of Audit's answer that these records were subject to grand-jury secrecy laws.

¶43.    The chancery court heard GP's claims against DMR and the Department of Audit on October 30 and 31, 2013. Testimony was provided at the hearings by two investigators for the Department of Audit in support of the Department of Audit's claim that the records in its possession fell under the MPRA's investigative-report exemption. The investigators said these records would disclose the identity of witnesses and impede the ongoing DMR investigation.

¶44.    But the investigators testified in general terms only. And their testimonies provided no explanation or even illustration as to how the uncopied original records in the Department of Audit's possession differed in any way from those records also in the Department of Audit's possession but for which DMR retained electronic copies.

¶45.    This, coupled with the fact that a "protective order" drafted by the aforementioned special assistant attorneys general only partly modified the grand-jury subpoena(s), leads us to no other conclusion than that reached by the chancery court: the uncopied original

16

documents in the Department of Audit's possession did not constitute "investigative reports" exempted by the MPRA.

¶46.    With much respect for the dissent, this is not the only reason why we agree with the chancery court's decision in this case.

¶47.    As mentioned, each subpoena contained the following language:  "This data is to be 'retained in-place' and shall be accessible upon demand by agents of the Mississippi Office of the State Auditor and *shall be released to no entity other than the Mississippi Office of the State Auditor*." (Emphasis added.)  This language extended beyond a requirement to produce documents to the grand jury, and was akin to a writ of mandamus or prohibition, that prohibited a governmental official from performing a specific act.  In other words, it can be construed as requiring DMR not to honor a pending MPRA request.  *See* e.g., ***Farson, Son & Co. v. Bird***, 248 U.S. 268, 270, 39 S. Ct. 111, 111, 63 L. Ed. 233 (1919) ("[T]he prayer was that the county treasurer be mandamused to pay. . . ."). We also recognize, as did the chancery court, that throughout all proceedings, all investigative agencies, state and federal, had access to these records.

¶48.    Moreover, when the federal district court examined these documents for purposes of Rule 6(e) of the Federal Rules of Criminal Procedure, it found as follows:

> [T]he documents are public records created by DMR and obtained by the State Auditor independent of the grand jury proceedings. The record contains no indication that disclosure would endanger the secrecy of the grand jury, which is the substantive purpose of Rule 6(e)(2). Therefore, based on the information currently before the Court, the DMR records are not a "matter occurring before the grand jury," and they are not subject to Rule 6(e)'s secrecy requirement.
>
> . . .

17

Accordingly, the Court finds that the need for the DMR records to remain secret is outweighed by the State Auditor's need to comply with the Chancery Court's order, the Chancery Court's obligation to enforce Mississippi's Public Records Act, and the principle of comity.

*United States v. Walker*, No. 1:13-CR-89-KS-MTP, 2013 WL 6805121, at **3, 6 (S.D. Miss. Dec. 20, 2013).

¶49. For these reasons, we find that the chancery court did not abuse its discretion in finding that the Department of Audit violated the MPRA by denying GP access to the public records.[9] [10] Even though the Department of Audit was not an original party to these proceedings, the Department of Audit delayed and expanded this litigation with a series of actions that defeated GP's records request, beginning with the issuance of subpoenas

---

[9] Section 25-61-15 has since been amended and states as follows:

Any person who shall deny to any person access to any public record which is not exempt from the provisions of this chapter or who charges an unreasonable fee for providing a public record may be liable civilly in his personal capacity in a sum not to exceed One Hundred Dollars ($100.00) per violation, plus all reasonable expenses incurred by such person bringing the proceeding.

Miss. Code Ann. § 25-61-15 (Supp. 2016).

[10] The dissent contends that Mississippi Office of the State Auditor, as a public body, cannot be held liable under Section 25-61-15 because the statute clearly states that only a person in his individual capacity can be held liable, not a public body. The chancery court's order finding that office liable under the MPRA was not challenged on that ground. Further, both this Court and the Court of Appeals have affirmed sanctions against public bodies under this section. *See Mississippi Dep't of Wildlife, Fisheries and Parks v. Mississippi Wildlife Enforcement Officers' Ass'n, Inc.* 740 So. 2d 925, 937 (Miss. 1999) (finding that the chancery court did not err in assessing penalties against the Department of Wildlife under Section 25-61-15); and *Harrison County Dev. Comm'n v. Kinney*, 920 So. 2d 497, 503-04 (Miss. 2006) (finding same with penalties assessed under Section 25-61-15 against the Commission).

18

demanding that no one else have access to the public records sought by GP. And when the chancery court ultimately decided that these documents were not exempt under the MPRA, the Department of Audit continued to frustrate GP's records request. The Department of Audit therefore is liable for expenses and attorney's fees in the amounts found and calculated by the chancery court.[11]

¶50. We disagree with the chancery court's finding that DMR violated the MPRA. The record illustrates, as the chancery court initially found, that DMR acted in good faith to resolve the public-records request. Accordingly, we find that DMR is not joint and severally liable for attorney's fees, costs, and expenses, and we vacate that portion of the judgment.

¶51. Additionally, we find no error in the chancery court's decision to fine Huggins $100 under Section 25-61-15. The record illustrates that Huggins knew on November 1, the day after the chancery court issued its bench ruling on October 31, that he might be subpoenaed by the AUSA to produce the DMR records in the Department of Audit's custody. Instead of contacting Patterson, Huggins called Attorney General Hood, who advised him to follow the instructions of the AUSA. On November 4, Huggins went to the federal courthouse, where he received a federal grand-jury subpoena, which mirrored the state grand-jury subpoenas, albeit without the added language contained in the state subpoenas requiring the

---

[11] We disagree with the dissent that the chancery court assessed the Department of Audit attorney's fees and expenses solely on the basis that it found the Department of Audit to be in contempt November 5 to December 5. Based on our reading of the chancery court's order, the chancery court held both the Department of Audit and DMR joint and severally liable for $36,783.50 in attorney's fees and $1,249.95 in expenses for violation of either the MPRA, and/or the MLAA, and/or for contempt of court. Further, even when a party purges itself of civil contempt, it still can be assessed attorney's fees and expenses for causing that contempt order to have been issued.

DMR documents to remain in place and not be released to any entity other than the Department of Audit. The federal grand-jury subpoena instructed that Huggins deliver the DMR documents in the Department of Audit's possession in Biloxi to the federal courthouse in Jackson by 9:00 a.m.

¶52. Testimony from State Auditor Pickering at the December 4 and 6 hearings shows that all attorneys representing him and the Department of Audit were assigned by the Attorney General's office. According to Pickering, his assigned attorney, Patterson, had agreed to bring the DMR records to the courthouse as ordered by the chancery court. After the chancery court issued its October 31 ruling, Pickering told his staff "the Court has ruled these records are public and open and should be copied, and let's move forward to do so." When Pickering was informed that Huggins had been subpoenaed, he also was told there was a way to comply with both the order and the federal subpoena. Pickering testified that Huggins made the decision to transport the records to Jackson and he (Pickering) was not informed of the decision until after the documents had been delivered to Jackson. Huggins testified that he had been ordered by Pickering to make the DMR documents available to GP and had been instructed to honor the chancery court's order. Huggins also testified he was aware that Patterson had agreed to make the documents available to GP and to set up a procedure whereby an agent could be present to maintain the Department of Audit's chain of custody.

¶53. We agree with the chancery court that Huggins knowingly denied GP access to the public documents after the October 31 ruling. Accordingly, we find no abuse of discretion in the chancery court's decision to fine Huggins $100 under Section 25-61-15.

¶54. No record evidence was presented that Pickering, Lott, or Patterson participated in the wrongful denial of GP's record requests. Attorney General Hood and Special Assistant Attorneys General Runnels, Chestnut, and Pizzetta were neither noticed nor called to testify at the December hearings. Therefore, we must vacate that portion of the chancery court's judgment assessing each of them fines under MPRA.

¶55. Lastly, we speak briefly to the federal grand-jury subpoenas issued through the AUSA, by reiterating to all concerned what the United States Supreme Court has stated:

> We live in the jurisdiction of two sovereignties, [the state and federal governments] each having its own system of courts to declare and enforce its laws in common territory. It would be impossible for such courts to fulfill their respective functions without embarrassing conflict unless rules were adopted by them to avoid it. The people for whose benefit these two systems are maintained are deeply interested that each system shall be effective and unhindered in its vindication of its laws. *The situation requires, therefore, not only definite rules fixing the powers of the courts in cases of jurisdiction over the same persons and things in actual litigation, but also a spirit of reciprocal comity and mutual assistance to promote due and orderly procedure.*

*Ponzi v. Fessenden*, 258 U.S. 254, 42 S. Ct. 309, 66 L. Ed. 607 (1922) (emphasis added).

No person or thing "can[] be in two places at the same time[;]" thus:

> [t]he chief rule which preserves our two systems of courts from actual conflict of jurisdiction is that the court which first takes the subject-matter of the litigation into its control, whether this be person or property, must be permitted to exhaust its remedy, to attain which it assumed control, before the other court shall attempt to take it for its purpose.

*Id*. at 260.

¶56. In *Covell v Heyman*, 111 U.S. 176, 4 S. Ct. 355, 28 L. Ed. 390 (1884), the Court also explained:

> The forbearance which courts of co-ordinate jurisdiction, administered under

a single system, exercise towards each other, whereby conflicts are avoided, by avoiding interference with the process of each other, is a principle of comity with perhaps no higher sanction than the utility which comes from concord; but between state courts and those of the United States, it is something more. It is a principle of right and of law, and therefore of necessity. It leaves nothing to discretion or mere conveni[e]nce. These courts do not belong to the same system, so far as their jurisdiction is concurrent; and although[] they co-exist in the same space, they are independent[,] and have no common superior. They exercise jurisdiction, it is true, within the same territory, but not in the same plane; and when one takes into its jurisdiction a specific thing, that res is as much withdrawn from the judicial power of the other as if it had been carried physically into a different territorial sovereignty. To attempt to seize it by a foreign process is futile and void.

*Id*. at 182. Undoubtedly, much of this matter could have been avoided had this been regarded.

## CONCLUSION

¶57. For these reasons, we reverse and vacate that portion of the Court of Appeals' judgment holding that the records sought by GP in the Department of Audit's possession constituted investigative reports exempted by the MPRA. We reverse that portion of the Court of Appeals' judgment that reversed and rendered the chancery court's judgment against the Department of Audit for violation of the MPRA. We reverse that portion of the Court of Appeals' judgment finding that Huggins was not liable for the $100 penalty provision under Section 25-61-15. We affirm the chancery court's ruling that the Department of Audit is liable for $36,783.50 in attorney's fees and $1,249.95 in expenses. We reverse and render the chancery court's ruling that DMR is joint and severally liable for the same. We reverse and vacate that portion of the chancery court's judgment assessing, pursuant to the MPRA, a $100 fine to Pickering, Hood, Lott, Patterson, Runnels, Chestnut, and Pizzetta. This case

22

is remanded for proceedings consistent with this opinion.

¶58. **AFFIRMED IN PART; REVERSED IN PART; VACATED IN PART; RENDERED IN PART; AND REMANDED IN PART.**

**WALLER, C.J., RANDOLPH, P.J., KING AND CHAMBERLIN, JJ., CONCUR. COLEMAN, J., DISSENTS WITH SEPARATE WRITTEN OPINION. KITCHENS, P.J., MAXWELL AND ISHEE, JJ., NOT PARTICIPATING.**

**COLEMAN, JUSTICE, DISSENTING:**

¶59. I would affirm the Court of Appeals' decision holding that the public records sought by Gulf Publishing Company, Inc., were exempt under the Mississippi Public Records Act's investigative-reports exemption and that reversed the chancellor's finding of contempt by the Department of Audit. Therefore, I dissent.

> **I.**      **The Department of Audit did not waive the investigative reports exemption under the Mississippi Public Records Act.**

¶60. The chancellor found and the majority holds that the Department of Audit waived any claim that the records sought by Gulf Publishing constituted investigative records and therefore were exempt under the Public Records Act. The majority bases its holding that the Department of Audit waived the exemption on the fact that two special assistant attorneys general, assigned to both the Department of Marine Resources and the Department of Audit, respectively, drafted and submitted a protective order requesting that the circuit court modify the grand jury subpoena to allow the Department of Marine Resources to release to Gulf Publishing copies of the public records. However, the majority cites no case or statutory law to support the proposition that the Department of Audit, which was not yet a party to the lawsuit, could have waived the exemption to the Public Records Act by the drafting of a

23

protective order by two special assistant attorneys general.

¶61.    Mississippi Code Section 25-61-12(2)(a) provides that "[w]hen in possession of a law enforcement agency, investigative reports shall be exempt from the provisions of this chapter; however, *a law enforcement agency, in its discretion, may choose to make public all or any part of the investigative report*." Miss. Code Ann. § 25-61-12(2)(a) (Supp. 2016) (emphasis added).  The statute does *not* provide that, if the law enforcement agency does make public any part of the investigative report, it waives the right to withhold other, undisclosed parts.  In fact, it provides the exact opposite: that a law enforcement agency can provide only part of the investigative report or all of the investigative report if it so chooses.  As the majority points out, the circuit court's protective order applied only to records in the possession of the Department of Marine Resources, and did not apply to the contested, original documents that were in the sole possession of the Department of Audit.  (Maj. Op. at ¶ 41).  The Department of Audit did not waive the exemption as to records that the attorney for the Department of Audit did not arrange to be included in the circuit court's order.  The chancellor made, and the majority makes, the mistake of applying an event and order applicable only to the records possessed by Marine Resources to documents possessed only by the Department of Audit.  There exists no evidence in the record that the Department of Audit waived the exemption as to the documents in its sole possession.

¶62.    Further, the protective order was submitted by the Department of Marine Resources, and it wholly excluded the Department of Audit.  The protective order was entered on January 22, 2013.  The Department of Audit did not become a party until August 2013.  Prior

24

to the Department of Audit becoming a party, Gulf Publishing never submitted a written records request to the Department of Audit. Before being made a party, the Department of Audit did every identifiable thing in its power to help the Department of Marine Resources, which could not claim an exemption under the Public Records Act, to comply with the records request. After being made a party, the Department of Audit immediately claimed the exemption.

## II. The records were exempt from disclosure under the Public Records Act.

¶63. The subpoena issued by the Harrison County Grand Jury required the Department of Marine Resources' records to be "to be 'retained in-place,'" to "be accessible upon demand by agents of the Mississippi Office of State Auditor," and to "be released to no entity other than [the Department of Audit]." The grand jury never relinquished control of the records. The subpoena designated the Department of Audit as the custodian of the records. Neither the grand jury nor the Department of Audit in its custodial capacity ever received a written request for the records.

¶64. Mississippi Code Section 25-61-11 provides:

> The provisions of this chapter shall not be construed to conflict with, amend, repeal, or supersede any constitutional law, state or federal statutory law, or decision of a court of this state or the United States which at the time of this chapter is effective or thereafter specifically declares a public record to be confidential or privileged, or provides that a public record shall be exempt from the provisions of this chapter.

Miss. Code Ann. § 25-61-11 (Supp. 2016).

¶65. Proceedings before the grand jury are secret. *See **Addkison v. State**,* 608 So. 2d 304,

25

312 (Miss. 1992) ("It is elemental that grand jury proceedings are cloaked with secrecy.")

(citing Miss. Code Ann. §§ 97-9-53 (1972), 13-5-61 (Supp. 1991)).

> If a grand juror, witness, district attorney, clerk, sheriff, or any other officer of the court, disclose the fact of an indictment being found or returned into court against a defendant, *or disclose any action or proceeding had in relation thereto, before the finding of the indictment*, or in six months thereafter, or until after the defendant shall have been arrested or given bail or recognizance to answer thereto, he shall be fined not more than two hundred dollars.

Miss. Code Ann. 97-9-53 (1972) (emphasis added); *see also* Miss. R. Crim. P. 13.5(b)(3).

In *State Farm Fire and Casualty Co. v. Hood*, the United States District Court for the Southern District of Mississippi considered whether portions of a court record should be sealed pursuant to Sections 13-5-61 and 97-9-53. The Court held:

> The only document brought to this court's attention that is arguably deserving of protection is the grand jury subpoena issued to State Farm on August 23, 2007. However, . . . the court is not convinced that disclosure of this subpoena would in any way reveal to the public the specifics of this grand jury investigation. The subpoena does not reveal the target of any investigation or the issues being investigated.

*State Farm Fire & Cas. Co. v. Hood*, No. 2:07CV188 KS-MTP, 2007 WL 4208288, at *1 (S.D. Miss. Nov. 2, 2007). In the present case, Investigator Chris Lott testified that he "used everything that's listed in [the] subpoena as part of the investigation" and that the undisclosed records related to the two accounts would disclose the identity of witnesses and defendants and impede the ongoing investigation. The records would reveal the targets and specific issues being investigated.

¶66. Further, Harrison County Circuit Court Judge Roger Clark issued a protective order finding that the subpoena duces tecum prohibited the Department of Marine Resources from

26

complying with the Public Records Act and allowing the release of documents in the Department of Marine Resources' possession. Therefore, the subpoena requiring that the requested records be released to no entity other than the Department of Audit created an exemption under law for the requested records.

¶67. The majority further finds that the records at issue did not constitute "investigative reports" exempted by the Public Records Act. Section 25-61-3 defines investigative reports as follows:

(f) "Investigative report" means records of a law enforcement agency containing information beyond the scope of the matters contained in an incident report, and generally will include, but not be limited to, the following matters if beyond the scope of the matters contained in an incident report:

(i) Records that are compiled in the process of detecting and investigating any unlawful activity or alleged unlawful activity, the disclosure of which would harm the investigation which may include crime scene reports and demonstrative evidence;

(ii) Records that would reveal the identity of informants and/or witnesses;

(iii) Records that would prematurely release information that would impede the public body's enforcement, investigative or detection efforts;

(iv) Records that would disclose investigatory techniques and/or results of investigative techniques;

(v) Records that would deprive a person of a right to a fair trial or an impartial adjudication;

(vi) Records that would endanger the life or safety of a public official or law enforcement personnel, or confidential informants or witnesses;

(vii) Records pertaining to quality control or PEER review

27

activities; or

> (viii) Records that would impede or jeopardize a prosecutor's ability to prosecute the alleged offense.

Miss. Code Ann. § 25-61-3(f) (Supp. 2016). We explained earlier in the year that:

> [s]ubsection (3)(f) is meant to be read in conjunction with subsection (3)(e). Subsection (3)(f) distinguishes the more detailed "investigative report," which contains matters that are beyond the simple information found in an incident report, and gives an illustrative list of type of information. While MDOC is correct that the list is nonexhaustive, it is nonetheless limited to the scope of subsection (3)(f). Subsection (3)(f) chiefly contemplates the investigatory stage(s) of criminal matters, and it allows law enforcement agencies to determine what is public record and what is not at this stage of the criminal process, so as not to jeopardize the investigation and/or endanger those affiliated.

***Miss. Dep't of Corr. v. Roderick & Solange MacArthur Justice Ctr.***, No. 2015-CA-00431-SCT, 2017 WL 1370983 (Miss. Apr. 13, 2017).

¶68. After the protective order was entered, Gulf Publishing received all the records requested except for certain unscanned, original documents related to two accounts. As noted above, Investigator Chris Lott testified that everything in the subpoena was used during the investigation and that the records would disclose the identity of witnesses and defendants and frustrate the ongoing investigation if specifics were printed in the newspaper. It is clear that the remaining documents, at least, fell within the investigative reports exemption to the Public Records Act.

¶69. I am wholly unconvinced by the logic of the majority and the chancellor that, because the circuit court's protective order "only partly" modified the grand jury subpoena, the original, uncopied documents were not truly considered by the Department of Audit to be

28

investigative reports.  (Maj. Op. at ¶ 45).  The modification to which I think the majority refers, that documents within the possession of the Department of Marine Resources could be produced to Gulf Publishing, continued the protection afforded by grand jury secrecy and the investigative reports exception to the uncopied, original documents at issue.  The record shows not that the Department of Audit and its attorneys considered the uncopied, original documents to be no different than those already in the possession of Marine Resources, but rather that the Department of Audit and its attorneys continued to assert that they were protected from disclosure.  It cannot follow, as it must for the majority to be correct, that the Department of Audit's attorney, Patterson, involved herself in the proceedings in circuit court and agreed to the protective order that continued to apply the exemption to the uncopied, original documents even though she saw no distinctions between the copied and uncopied original and undisclosed investigative documents.

### III.    The chancellor erred in holding the Department of Audit in criminal contempt without recusing for the matter to be heard by another judge.

¶70.    The chancellor's final order found the Department of Audit in civil contempt for failing to abide by the chancellor's orders directing that the documents be produced to Gulf Publishing.  As a penalty for the civil contempt, the chancellor ordered the Department of Audit to pay court costs and reasonable attorneys' fees for the contempt period, which the chancellor found to be from November 5, 2013, to December 5, 2013.  However, by the time the chancellor ordered the sanctions, the Department of Audit had purged the contempt.  Accordingly, the sanctions were not issued in order to compel compliance with the

29

chancellor's earlier orders but, rather, to punish. Therefore, the chancellor mischaracterized the contempt as civil; it was criminal contempt. Furthermore, because much of the alleged contemptuous behavior took place outside the personal knowledge of the chancellor, it was constructive criminal contempt. The law on contempt required the chancellor to recuse herself, but she did not. Her failure to follow the law on the instant point constitutes reversible error.

¶71. The majority justifies affirmance of the contempt order by characterizing the sanctions as imparted pursuant to Section 25-61-15, which provides:

> Any *person* who shall deny to any person access to any public record *which is not exempt* from the provisions of this chapter or who charges an unreasonable fee for providing a public record may be liable civilly *in his personal capacity* in a sum not to exceed One Hundred Dollars ($100.00) per violation, plus all reasonable expenses incurred by such person bringing the proceeding.

Miss. Code Ann. § 25-61-15 (Supp. 2016) (emphasis added). Contrary to the majority's characterization of the chancellor's decision, the chancellor did not sanction the Department of Audit pursuant to Section 25-61-15. Rather, the chancellor entered a detailed order that explained at length that the sanctions were intended as a civil contempt penalty. The chancellor merely footnoted Section 25-61-15.

¶72. Moreover, there are at least two problems with the majority's holding that the chancellor did not err in making the Department of Audit pay court costs and one month of Gulf Publishing's attorneys' fees pursuant to Section 25-61-15 alone. (Maj. Op. at ¶ 49). First, the records in question are exempt form disclosure under the Public Records Act, so the Department of Audit could not violate the statute. Second, the statute clearly states that

30

a person in his individual capacity can be liable under Section 25-61-15, not a public body. Therefore, the Department of Audit, as a public body, cannot be liable under Section 25-61-15.

¶73. Turning to the vehicle actually chosen by the chancellor, she found the Department of Audit in civil contempt of her October 31, 2013, bench ruling ordering the Department of Audit to copy and produce the disputed documents and her November 4, 2013, order directing the Department of Audit – hours before the federal subpoena directed him to produce the documents – to copy the documents under the Court's supervision.

¶74. In short, I agree with the Court of Appeals. The chancellor ordered the sanction in her order dated May 27, 2014, but found therein that the Department of Audit had purged the contempt on December 5, 2013. The purpose of civil contempt is to compel compliance with a court order. *In re McDonald*, 98 So. 3d 1040, 1043 (¶ 7) (Miss. 2012). Because the Department of Audit had complied with the court's order months before the court set the sanctions, it is impossible that the sanctions were imposed to compel compliance. Rather, the sanctions must be considered to be imposed for punishment and were, therefore, proper only if the Department of Audit was guilty of criminal contempt. *Id.*

¶75. Moreover, if contempt it was, the Department of Audit's failure to comply was constructive contempt rather than direct contempt. Constructive criminal contempt applies when the contemptuous behavior occurs – even in part – outside the presence of the trial judge. *Id.* at 1044 (¶ 6). On the other hand, direct criminal contempt occurs when the acts in question occur "in the very presence of the judge making all the elements of the offense

personal knowledge." *Id.* (citing *Varvaris v. State*, 512 So. 2d 886, 887–88 (Miss.1987)). In the case *sub judice*, the chancellor found the Department of Audit in contempt for several acts that occurred outside her presence and as to which she lacked personal knowledge, including delivering the contested documents to the federal grand jury and failing to produce the contested records to the Department of Marine Resources. Accordingly, the contempt, if any, was constructive criminal contempt.

¶76. A trial judge who institutes constructive criminal contempt proceedings must recuse and let the hearing be conducted by another judge. *McDonald*, 98 So. 3d at 1044 (¶ 9). The Court has repeatedly so held. *Id.* In the instant case, the chancellor did not recuse herself; the Court of Appeals correctly held that the finding of civil contempt against the Department of Audit must be reversed. The chancellor further erred in finding that the Department of Audit had waived her recusal, as the recusal is something the law requires directly of the judge. *Id.* The party need not request it at all, and therefore cannot waive it by failing to request it.

**Conclusion**

¶77. The facts of the instant case do not bear out the majority's holding that the Department of Audit waived the investigatory records exemption or grand jury secrecy as to the uncopied, original documents that at the relevant time were in the sole possession of the Department of Audit. The facts show the opposite: although the Department of Audit acted to facilitate the dissemination of those records that had been copied and remained in the possession of the Department of Marine Resources, it continued to protect the uncopied, original

32

documents. Protection from disclosure not being waived, I would hold that the chancellor erred in ordering their production to Gulf Publishing pursuant to both.

¶78. Moreover, pursuant to well-established law, the chancellor erred in finding the Department of Audit in criminal contempt without recusing herself. In affirming the contempt award against the Department of Audit, the majority undermines fundamental due process protections that should be available to parties accused of constructive criminal contempt.

¶79. Finally, in affirming the chancellor and reversing the Court of Appeals, the majority leaves unaddressed other assignments of error raised by the appellants that could result in a reversal of the chancellor. For example, the Court of Appeals declined to consider the Department of Marine Resources' argument that the chancellor erred in recanting earlier rulings in its favor because it found the investigative records exemption issue to be dispositive of all issues. The majority today remains silent as to the issue and other issues raised in the five appellants' briefs, even though, on the merits, one or more of them might well command a different holding from us. The choice of a majority of the Mississippi Supreme Court to ignore issues raised by parties appearing before it troubles me. If the majority does not wish to address them, perhaps the majority should remand the case to the Court of Appeals to consider the remaining, as yet unaddressed, issues.